IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED

2010 JUL 23  P 2: 50

_____DISTRICT COURT
RICHMOND, VIRGINIA

|  |  |
|---|---|
| Performance Food Group Company, LLC,<br>f/k/a Performance Food Group<br>12500 West Creek Parkway<br>Richmond, Virginia 23238 | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )   CIVIL ACTION NO. 3 : 10 C V 506 |
| James M. Dawson,<br>2826 193rd Place<br>Lansing, Illinois 60438 | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

## COMPLAINT

Plaintiff Performance Food Group Company, LLC, formerly known as Performance Food Group ("PFG"), by counsel, states the following as and for its Complaint against Defendant James M. Dawson ("Dawson"):

### NATURE OF THE ACTION

1.    This action arises from a breach of fiduciary duty and a breach of contract by Dawson through unlawful acts, including, but not limited to, misappropriating trade secrets and confidential and proprietary business information, and providing a PFG competitor with information to assist that competitor in gaining an advantage over PFG in the course of its business, while Dawson was still employed by PFG.

2.    Dawson joined PFG in the Fall of 2005 as a District Sales Manager. By late 2008, Dawson's performance was slipping and sales in his district were unsatisfactory. In 2009,

he was given a choice: cooperate with a plan to increase performance or suffer a demotion to a salesman. Instead of taking on the initiative to cure his failing performance, Dawson accepted the demotion effective January 2009. He tendered his resignation on May 7, 2010, offering to stay on until May 21, 2010.

3.      However, in the days before and after his resignation, Dawson engaged in an unlawful scheme to deliver PFG's confidential, proprietary and trade secret information to one of PFG's competitors. Moreover, Dawson had the audacity to commit his wrongful acts in broad daylight using his PFG e-mail account. As it turns out, these emails were sent to employees of Reinhart Food Service ("Reinhart"), a competitor of PFG, and the same company that had or would offer him a job before his departure from PFG. Indeed, a preliminary investigation into Dawson's activities suggests he had been misappropriating PFG's information and sending it to Reinhart employees since as early as December 2009.

4.      PFG promptly terminated Dawson effective May 21, 2010, after learning of Dawson's misappropriation of its confidential, proprietary and non-public information and his intention to work for Reinhart – the very company to whose employees Dawson had been unlawfully funneling PFG information. PFG brings this lawsuit to ensure that Dawson's tortious conduct is enjoined, that the full breadth of his conduct is exposed and that PFG be justly compensated for the losses it has suffered as a result of Dawson's treachery.

## PARTIES

5.      PFG is a Delaware limited liability company with its principal place of business in Richmond, Virginia. PFG is a leading food service distributor, delivering food and food-related products to restaurants and institutional customers throughout the United States and internationally.

2

6.      Dawson is a natural person who, upon information and belief, is an Illinois resident and resides at 2826 193rd Place, Lansing, Illinois 60438. Beginning on or about January 12, 2009 through his termination on May 21, 2010, Dawson was a "Business Developer" or salesperson for PFG. He formerly served as a District Sales Manager from November 2005 until January 2009, but was demoted for performance reasons. In connection with, and as a condition of his hiring, Dawson executed a Confidentiality, Noncompetition, Nonsolicitation, Non Disclosure Agreement (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

7.      Diversity of citizenship exists between PFG, a Delaware company with its principal place of business in Richmond, Virginia, and Dawson, who is a citizen of Illinois.

8.      The amount in controversy in this action exceeds $75,000.

9.      Accordingly, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

10.     Dawson is subject to personal jurisdiction in this Court as a consequence of his consent in the Agreement to personal jurisdiction in a federal court located in Richmond, Virginia. Paragraph 10 of the Agreement states, "[t]he parties agree that they will not file any action arising out of this Agreement other than in a state or federal court located in Richmond, Commonwealth of Virginia ("Forum"). The parties consent to personal jurisdiction and venue solely within this Forum and waive all otherwise possible objections thereto."

11.     Venue is proper in this Court because Dawson consented in the Agreement to venue in a federal court located in Richmond, Virginia.

3

## ALLEGATIONS OF FACT

**A.    PFG's Confidential, Proprietary and Non-Public Information**

12.    PFG is comprised of several companies that operate throughout the United States and internationally to distribute a vast assortment of national and proprietary food and food-related products to restaurants and institutional customers.  PFG maintains unique business relationships with its clients, who rely on PFG for everything from food distribution to operations and operational strategies.

13.    In the course of operating its business, PFG has expended significant resources in developing confidential, proprietary and non-public information pertaining to current or former employees, hires or prospective hires, sales and marketing strategy reports, customer lists and contact information, customer prospect material, customer profiles and analyses, price lists and pricing and/or rate structures, responses to requests for proposals, presentations, staffing profiles and computer software systems and methodologies.  This confidential, proprietary and non-public information allows PFG to provide its customers with unique and valuable food distribution and operational services, thus giving PFG an advantage over its competitors.

14.    PFG has developed substantial good will with its customers and prospective customers, and possesses confidential and proprietary information relating to those customers, their needs and preferences, and their operations.

15.    In light of the competitive nature of the food distribution industry, PFG takes significant measures to protect its trade secrets and confidential business information, including, without limitation, customer data, the terms and conditions of its contracts with customers, its pricing policies, its sales and marketing plans and strategies, its financial information and its business plans and strategies.  PFG requires certain employees with access to such information,

4

such as Dawson, to sign employment agreements containing confidentiality, noncompetition, nonsolicitation and nondisclosure provisions.

**B.    Timeline of Dawson's Employment at PFG**

16.    Dawson was hired by PFG in or about November 2005 as a District Sales Manager. He served in that capacity until he was demoted to the position of salesperson in January 2009.

17.    On May 7, 2010, Dawson gave his two-week notice that he was leaving PFG. Dawson later confirmed that he would be accepting employment with Reinhart, a competitor of PFG.

18.    PFG discovered in the days following Dawson's resignation that he had delivered PFG's confidential, proprietary and trade secret information to employees of Reinhart, PFG's competitor and Dawson's future employer. After further inquiry, PFG found that Dawson had been sending such information to Reinhart employees since as early as December 2009.

19.    Based on PFG's discovery of the foregoing facts, Dawson was relieved of his duties at PFG on May 14, 2010, and was terminated effective May 21, 2010.

20.    PFG notified Reinhart's General Counsel on May 17, 2010 that Dawson had violated the Agreement by sending PFG's confidential, proprietary and trade secret information to Reinhart employees. PFG demanded that Reinhart destroy any records related to Dawson, including e-mails from him and any records sent to private e-mail addresses of Reinhart employees.

21.    On May 26, 2010, Reinhart's General Counsel responded stating that Reinhart had searched its records and did not find any e-mails or documentation from Dawson. In addition, Reinhart's General Counsel stated that Ed Bove and Russell Derry – Reinhart

employees and individuals who, upon information and belief, received e-mails from Dawson

conveying PFG's confidential, proprietary and non-public information – had signed certifications

swearing that they destroyed any and all e-mails and other documentation received from

Dawson, and promising not to use such documentation and information.

     22.    At or around this time, and, upon information and belief, recognizing the unlawful

acts in which Dawson and certain Reinhart employees had engaged, Reinhart withdrew

Dawson's offer of employment.

     23.    Upon information and belief, Dawson has obtained employment with Fox River

Foods, another food service company that competes with PFG.

**C.    Dawson's Obligations to PFG**

     24.    As a District Sales Manager, Dawson's responsibilities included managing a team

of sales people (area managers) in District 11, which comprised south Chicago, south suburban

Chicago, northwest Indiana and other areas immediately south of the southern suburbs of

Chicago. He was responsible for customer relations, training and recruiting of area managers,

building and executing the strategic plans and building the sales budget for the District. Dawson

provided oversight and leadership in the areas of sales, delivery, strategy, client relations,

operations, staffing and financial reporting, among other duties and responsibilities.

     25.    As a salesperson, Dawson's responsibilities included increasing the sales and

profits to current customers and bringing on new business to increase PFG's market share in his

area of responsibility. He was responsible for all aspects of customer satisfaction, was charged

with promoting PFG in a positive light with his customer base and providing them with new

products and ideas to help improve their business results. Dawson had significant contacts with

current and prospective PFG customers.

6

26.     As an employee at PFG, Dawson was privy to PFG's business and employment strategies, policies and marketing/sales information including without limitation, financial data, business plans, promotional materials, price lists, price books, order guides, pricing and pricing strategies, profit and loss statements and sales and account records.  In addition, Dawson had access to present and potential customer lists, customer classifications, customer specifications and purchasing patterns and customer credit information.  Dawson also had access to PFG's supplier and vendor information and the purchasing terms PFG maintains with those suppliers and vendors.  Finally, Dawson was privy to how PFG provides products and services to its clients and the nature, origin, composition and development of PFG's brands and products.

27.     Dawson had access to valuable trade secrets and confidential and proprietary information belonging to PFG during the course of his employment at PFG.

28.     As a condition of his offer of employment with PFG, Dawson was required to execute the Agreement, which he did on October 10, 2005.

29.     Paragraph 1 of the Agreement defines "Confidential Information" and "Trade Secrets" as follows:

> d. "Confidential Information" means information about [PFG] and its employees, customers, vendors and/or suppliers which is not generally known outside of [PFG], which [Dawson] learns of in connection with [Dawson's] employment with [PFG], and which would be useful to competitors of [PFG].  Confidential Information includes, but is not limited to: (1) business and employment policies, marketing methods and the targets of those methods, financial data, business plans, promotional materials, price lists, price books, order guides, pricing and pricing strategies, profit and loss statements, and sales and account records; (2) present and prospective customer lists, customer classes, customer preferences and busing patterns, and customer credit information; (3) the terms upon which [PFG] obtains products from its vendors and/or suppliers and sells them to customers; and (4) the manner in which [PFG] provides products and services to its customers; and (5) nature, origin, composition and development of [PFG's] brands and products.

7

e. "Trade Secrets" means Confidential Information which meets the additional requirement of the Uniform Trade Secrets Act or similar state law.

30.     Paragraph 2 of the Agreement prevents Dawson from divulging or using for his own benefit, either during or subsequent to his employment with PFG, any Confidential Information or Trade Secrets learned or developed by him during his employment, as follows:

2.     Duty of Confidentiality. To assist [Dawson] in the performance of his or her duties for [PFG], [PFG] has provided and will provide to [Dawson] certain Confidential Information. [Dawson] agrees that during employment with [PFG] and for a period of five (5) years following the cessation of that employment for any reason, [Dawson] shall not directly or indirectly divulge or make use of any Confidential Information or Trade Secrets without prior written consent of [PFG]. [Dawson] further agrees that if [Dawson] is questioned about information subject to this Agreement by anyone not authorized to receive such information, [Dawson] will promptly notify [Dawson's] supervisor(s) or an officer of [PFG]. This Agreement does not limit any longer period of protection or the remedies available under applicable common or statutory law, which may impose longer duties of non-disclosure.

31.     Paragraph 10 of the Agreement provides for certain remedies and the forum for pursuing such remedies as follows:

10.     Remedies and Forum. The parties agree that they will not file any action arising out of this Agreement other than in a state or federal court located in Richmond, Commonwealth of Virginia. ("Forum"). The parties consent to personal jurisdiction and venue solely within this Forum and waive all otherwise possible objections thereto. The prevailing party shall be entitled to recover its costs and attorney's fees in any such proceeding. The existence of any claim or cause of action by [Dawson] against [PFG], including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of said covenants by injunction.

32.     Paragraph 11 of the Agreement provides that the "Agreement shall be governed and interpreted according to the laws of the Commonwealth of Virginia."

33.     Under the Agreement, Dawson's duty of confidentiality with respect to

Confidential Information and Trade Secrets existed during his term of employment with PFG

and extends for a period of five years after May 21, 2010, until May 20, 2015.

34.     PFG's Employee Handbook sets forth, among other things, certain, but not all,

responsibilities of PFG's employees.

35.     The Employee Handbook was distributed to Dawson, and he was aware of its

contents. PFG's policy is to distribute the Employee Handbook to every new employee, who

must sign and acknowledge that he or she received the Employee Handbook. Dawson signed the

statement acknowledging his receipt of the Employee Handbook.

36.     The Employee Handbook includes a non-exhaustive list of prohibitive conduct

including, but not limited to:

> 3.     Theft, unauthorized possession, or misappropriation of Company
> property, or of the property of a customer or a fellow associate.
>
> . . . .
>
> 5.     Deliberate misuse of or unauthorized use of Company supplies,
> materials, machines, or tools.
>
> . . . .
>
> 19.     Unauthorized disclosure of confidential information.
>
> . . . .
>
> 23.     Conduct that reflects adversely on the Company or discourteous
> treatment of a customer.

37.     The "Confidentiality" provision of the Employee Handbook prohibits PFG

employees from divulging confidential information as follows:

> It is the policy of [PFG] to ensure that the operations, activities and
> business affairs of the Company and our customers are kept confidential to
> the greatest extent possible. If, during employment, an associate acquires
> confidential or proprietary information about [PFG] and its customers,

9

such information is to be handled in strict confidence and not to be discussed with outsiders. Associates are also responsible for the internal security of such information by preventing the release or sharing of information beyond persons who may need such information due to their job.

38.     During his employment with PFG, Dawson owed fiduciary duties of loyalty and good faith to PFG. As a current employee, Dawson had a duty not to compete with PFG, to divert business away from PFG, or to disclose any information to third parties for his personal gain or the gain of others. Dawson had a duty to act solely for the benefit of PFG in all matters connected with his employment with PFG.

**D.     Dawson's Unlawful Acts**

39.     During the last weeks of his employment, Dawson accessed, copied and removed from PFG confidential customer and potential customer information, including Confidential Information and Trade Secrets, with the purpose and intent of using such information on a competitor's behalf.

40.     Specifically, just before announcing his resignation, and until his departure from PFG, Dawson e-mailed to various individuals several documents, all of which contained PFG's confidential and proprietary information concerning, among other things, detailed customer information. For example, Dawson sent confidential and proprietary information to allothers@comcast.net, which upon information and belief is the personal e-mail address of Ed Bove, who works at Reinhart. He sent confidential and proprietary information to russ1451@aol.com, which is the personal e-mail address of Russell Derry, who works at Reinhart. He sent at least one e-mail to Mary Kwiatkowski-Soukoup, foodservice director at Prairie Manor (a PFG customer), in which he references "Russ" and "my new Boss" at "Reinhart." And Dawson sent e-mails to Lanette Paper (a former PFG employee) and Bill

10

Mendoza with Community Hospital (a PFG customer) regarding work done in competition with

PFG.

      41.    Prior to his termination, Dawson's dispersal of PFG's Confidential Information to

competitors included, but upon information and belief was not limited to, the following:

- A December 28, 2009 e-mail to russl451@aol.com and allothers@comacst.net attaching PFG product information for Texas Corral, a PFG customer.

- A May 3, 2010 e-mail to russl451@aol.com attaching PFG Order Guides (including pricing information) for American Food Distributors, Community Hospital and Petro's Restaurants, who are all PFG customers. The subject line of the e-mail reads: "Not to be opened until I tell you."

- A May 3, 2010 e-mail to allothers@comcast.net and russl451@aol.com attaching PFG's Menu Analysis, a company directory and several Special Order Requests (including pricing information) for St. Catherine's Hospital, a PFG customer.

- A May 3, 2010 e-mail to allothers@comcast.net with the subject line "Not to be opened until I tell you" attaching PFG Order Guides (including pricing information) from Arrenello's Pizza, Inc.; Arrenello's Pizza Two; A Via; Bambino's; Bench Warmers; Carrey's Care; Chicago Dough Company; DS Meats, Inc.; Ersula Howard Child Care; Fasos Pizza; Golden Crown-Lansing; Isabella; Limestone City Grill; Los Angeles Restaurant; McKinley Roseland High School; Minis Kitchen; Minne Monesse Golf Course; and Old Town Tap, Inc., which are all PFG customers.

- A May 3, 2010 e-mail to allothers@comcast.net attaching a PFG excel file titled "Tomato comparison sheet 1-25-09.xls" that is labeled "PFG Confidential."

- A May 4, 2010 e-mail to allothers@comcast.net attaching PFG Order Guides (including pricing information) for Pizza by Geneo, Prairie Manor, Savoia, Southside Preschool and the Speed School, all PFG customers.

- A May 6, 2010 e-mail to allothers@comcast.net and Mary Kwiatkowski-Soukup attaching a PFG Order Guide (including pricing information) for Prairie Manor, a PFG customer. In his e-mail, Dawson states he is attaching documents that the recipients "requested (commanded me to [sic]) that [he] get for [them] when [they] talk to Sarah from ITT Source Tech." Upon information and belief, ITT Source Tech is a company that offers, among other things, software products related to the food service industry. The e-mail continues stating, "I have contacted my new Boss and told him that we need to be a package deal when I transfer my services to Reinhart."

11

- A May 6, 2010 e-mail exchange between Dawson and lanettepaper@yahoo.com regarding the creation and payment for custom labels for Community Hospitals, one of PFG's clients. In these e-mails, Dawson states that he will meet with Bill Mendoza from Community Hospitals on May 6, 2010 and that they will call the vendor together from the hospital. Dawson informs the vendor that it can bill either "Russ," who upon information and belief is Russell Derry with Reinhart, or Dawson and "we will get you your money from Reinhart."

- A May 6, 2010 e-mail to Lanette Paper providing the mailing address for St. Catherine's Hospital, a PFG customer, for the shipment of the custom labels discussed in the above-mentioned e-mail.

- A May 6, 2010 e-mail to allothers@comcast.net providing PFG's manufacturer numbers for pie lids and pie shells.

- A May 10, 2010 e-mail to allothers@comcast.net and russl451@aol.com. The subject of the e-mail is "Employment" and the text reads: "Gentlemen, [p]lease let the customers know that I am around for the 2 weeks. Please don't take my business. I am still on commission That includes all accounts . . . PLEASE."

- A May 12, 2010 e-mail to russl451@aol.com attaching PFG Purchase Order No. 101891 for a purchase made by Community Hospitals on May 12, 2010.

42.     All of these e-mails were sent from Dawson's PFG e-mail account.

43.     Dawson did not have authorization to disclose any confidential or proprietary information, or trade secrets, to anyone outside of PFG, including particularly, employees of Reinhart.

44.     All of the e-mails were sent while Dawson was employed by PFG.

45.     Upon information and belief, and based on the foregoing, Dawson has used or plans to use this confidential and proprietary business information belonging to PFG for his personal benefit or the benefit of a PFG competitor.

46.     Reinhart, or its agents, obtained PFG's pricing information from Dawson while Dawson was employed at PFG.

47.     Upon information and belief, Dawson's disclosure of PFG's confidential pricing information to Reinhart and other competitors has caused PFG to lose business. For example,

12

upon information and belief, Reinhart has decreased its prices for some of the customers it shares with PFG to $0.01 less than what PFG charged these customers for the same products.

48.     While employed at PFG, Dawson actively competed against PFG by performing work for PFG's customers for his own benefit and the benefit of a competitor and to the detriment of PFG.

49.     For example, in the May 6, 2010 e-mail exchange with lanettepaper@yahoo.com mentioned above, Dawson discussed the creation of a custom food label for Community Hospitals, a PFG customer.  In that e-mail, Lanette Paper asked whom to invoice for the printing of the custom label.  Dawson replied to Lanette Paper's inquiry stating that "either Russ or I" should be billed for the custom labels and that one of them "will get you your money from Reinhart," not from PFG.  At the time of the e-mail, Dawson was still a PFG employee, had not tendered his resignation, and Community Hospitals was a PFG customer.

50.     Upon information and belief, Dawson's actions in sending confidential information to competitors has caused PFG's customers to leave PFG for other competitors.

51.     Several of PFG's current customers whose accounts were managed by Dawson have cut back on their PFG business since Dawson's departure.  The full extent of Dawson's use of confidential, proprietary and trade secret information, and the precise amount of damages caused by his misconduct, is not yet known.

52.     Upon information and belief, while Dawson was employed at PFG, Dawson contacted several PFG customers and prospective customers.  During such contacts, Dawson made false and disparaging comments about PFG.  The purpose of Dawson's contact and communications was to dissuade such customers from doing business with PFG.  Upon

13

information and belief, one PFG customer stopped purchasing from PFG because Dawson informed that customer that PFG treated Dawson wrongly and was trying to "blackball" Dawson.

53.     Upon information and belief, Dawson utilized PFG's computers and e-mail servers to execute some or all of the above communications and solicitations.

54.     PFG has suffered damages in lost sales and profit and customer good will as a consequence of Dawson's wrongful disclosure of PFG's confidential and proprietary information and trade secrets, by diverting business away from PFG and by speaking disparagingly about PFG.

55.     In addition, PFG has suffered damages in lost sales and profit and customer good will as a consequence of Dawson's wrongful competition with PFG, diversion of business away from PFG, and disclosure of information to third parties for his personal gain and for the gain of others, before his termination of employment from PFG.

## COUNT I – BREACH OF CONTRACT

56.     The allegations of paragraphs 1 through 55 are re-alleged and incorporated as if set forth fully herein.

57.     The Agreement between Dawson and PFG, which was a condition of his initial employment with PFG, is a valid and binding contract and is supported by adequate mutual consideration.

58.     The covenants and restraints contained in the Agreement are reasonable and fair.

59.     Paragraph 2 of the Agreement creates a legally enforceable obligation of Dawson that he will not at any time, either during the term of the Agreement, or for a period of five years thereafter, disclose Confidential Information and Trade Secrets, as those terms are defined in paragraph 1 of the Agreement.

14

60.   The duty of confidentiality restriction is paragraph 2 of the Agreement is reasonably limited to prohibiting Dawson's disclosure of PFG's Confidential Information and Trade Secrets to third parties while he is employed by PFG and for five years after his employment ends.  Such restriction is necessary to protect PFG's vital interest in its Confidential Information and Trade Secrets and customer goodwill.

61.   Dawson has disclosed PFG's Confidential Information and Trade Secrets to third parties without PFG's consent both during his period of employment with PFG and, upon information and belief, after his employment with PFG was terminated, in violation of paragraph two of the Agreement.

62.   As a direct and proximate result of Dawson's actions, PFG has sustained substantial compensatory damages including, but not limited to, loss of income, lost profits, damage to reputation, and other damages, in an amount to be proven at trial, but in an amount that far exceeds $75,000.

**COUNT II – BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**

63.   The allegations of paragraphs 1 through 62 are re-alleged and incorporated as if set forth fully herein.

64.   Dawson was a full-time PFG employee until May 21, 2010.

65.   Dawson owed PFG fiduciary duties and a duty of loyalty and good faith resulting from his employment relationship with PFG.

66.   Dawson owed PFG a duty not to assist a PFG competitor in competing against PFG and not to act for his personal benefit to the detriment of PFG while employed by PFG.

15

67.     Dawson owed PFG a duty not to divert business away from PFG, or to disclose any information to third parties for his personal gain or the gain of others, before the termination of his employment.

68.     Dawson had a duty to act solely for the benefit of PFG in all matters connected with his employment with PFG.

69.     Dawson, as a PFG employee, had a fiduciary duty of loyalty to PFG not to compete against PFG for either his own benefit or for the benefit of a competitor.

70.     Despite Dawson's fiduciary duties and duty of loyalty and good faith to PFG, Dawson acted inconsistently with these duties.

71.     Dawson breached his common law fiduciary duty and duty of loyalty and good faith, while employed by PFG, by:

- providing information to a competitor with the purpose of assisting that competitor in gaining an advantage over PFG in the course of its business;

- actively competing against PFG by performing work for PFG's customers for his own benefit and for the benefit of a competitor and to the detriment of PFG;

- making false and disparaging comments about PFG to PFG's customers and prospective customers, vendors and suppliers;

- using PFG's computers and property for his own benefit, or for the benefit of another other than PFG during his employment, without authorization;

- failing to act solely for the benefit of PFG in all matters connected with his employment with PFG; and

- engaging in other unlawful conduct as set forth in the Complaint.

72.     By the actions described herein, Dawson has willfully, wantonly and intentionally breached his fiduciary duties and duties of loyalty to PFG.

73.     Dawson acted with malice in breaching his fiduciary duties and duty of loyalty and good faith to PFG.

16

74.    Dawson's conduct directly and proximately caused, and will continue to cause, PFG to suffer irreparable harm to its business, reputation, good will and customer relations, in addition to its loss of competitive position in the marketplace.

75.    As a direct and proximate result of Dawson's actions, PFG has sustained substantial damages in an amount to be proven at trial, but in an amount that far exceeds $75,000.

76.    Dawson's breach of fiduciary duties and duty of loyalty to PFG was willful, malicious, wanton and intentional warranting punitive damages in an amount no less than $1,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Performance Food Group Company, LLC prays for and moves this Court to:

(a)    Enjoin Defendant James M. Dawson from violating the Confidentiality, Noncompetition, Nonsolicitation, Non Disclosure Agreement, including, but not limited to, his non-disclosure and non-use of Confidential Information and Trade Secrets obligations in paragraph 2;

(b)    Enjoin and restrain Defendant James M. Dawson from engaging in the future use of Performance Food Group Company, LLC's Confidential Information, Trade Secrets, or proprietary information.

(c)    Enjoin and restrain Defendant James M. Dawson from engaging in future activities that would result in the misappropriation of Performance Food Group Company, LLC's Confidential Information, Trade Secrets, or proprietary information.

17

(d)     Require Defendant James M. Dawson to return all of Performance Food Group Company, LLC's property within Dawson's possession, or in the possession of anyone acting in concert with Dawson, and the certification by Dawson's counsel that all reasonable steps have been taken to comply with the Court's order;

(e)     Award Plaintiff Performance Food Group Company, LLC compensatory damages in an amount to be proven at trial, together with prejudgment interest at the maximum rate allowable by law;

(f)     Award Plaintiff Performance Food Group Company, LLC punitive damages in an amount to be proven at trial;

(g)     Require Defendant James M. Dawson to account for any profits he obtained as a result of any of the wrongful and illicit conduct as described herein;

(h)     Impose a constructive trust to disgorge any profits obtained by Defendant James M. Dawson as a result of any of the wrongful, illicit and tortious conduct as described herein;

(i)     Award Plaintiff Performance Food Group Company, LLC all legal fees and costs incurred in connection with bringing this action in accordance with Paragraph 10 of the Agreement; and

(j)     Award Plaintiff Performance Food Group Company, LLC whatever additional relief as deemed appropriate in the circumstances.

Dated: July 23, 2010

Respectfully submitted,

PERFORMANCE FOOD GROUP
COMPANY, LLC

By Counsel

Anne Bentley McCray (VSB No. 42209)
amccray@mcguirewoods.com
Brian Pumphrey (VSB No. 47312)
bpumphrey@mcguirewoods.com
Jeffrey D. McMahan, Jr. (VSB No. 77067)
jmcmahan@mcguirewoods.com
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23114
Telephone: (804) 775-1000
Facsimile: (804) 775-1061

*Attorneys for Plaintiff Performance Food
Group Company, LLC*